```
 1                     UNITED STATES DISTRICT COURT
                      CENTRAL DISTRICT OF CALIFORNIA
 2                    WESTERN DIVISION - LOS ANGELES

 3

 4   ADRIAN HUMBERTO RIOS,        )  Case No. CV 22-3968-WLH (RAOx)
     et al.,                     )
 5                                )  Los Angeles, California
           Plaintiffs,           )  Friday, August 30, 2024
 6                                )  10:55 A.M. to 11:38 A.M.
              v.                 )
 7                                )
     CITY OF AZUSA, et al.,       )
 8                                )
           Defendants.           )
 9   _____ )

10

11

12

13                   TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE WESLEY L. HSU
14                 UNITED STATES DISTRICT JUDGE

15

16   Appearances:               See Page 2

17   Deputy Clerk:              Holidae Crawford

18   Court Reporter:            Recorded; CourtSmart

19   Transcription Service:     JAMS Certified Transcription
                                16000 Ventura Boulevard #1010
20                              Encino, California  91436
                                (661) 609-4528
21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

```
 1   APPEARANCES:

 2

 3   For the Plaintiffs:    McKenzie Scott PC
                            By:  MARCUS S. BOURASSA
 4                          1350 Columbia Street, Suite 600
                            San Diego, California  92101
 5                          (619) 794-0451
                            mbourassa@mckenziescott.com
 6
                            Skapik Law Group APC
 7                          By:  GERALYN L. SKAPIK
                            5861 Pine Avenue, Suite A1
 8                          Chino Hills, California  91709
                            (909) 398-4404
 9                          gskapik@skapiklaw.com

10                          Southern California Lawyers Group PLC
                            By:  ERIC C. MORRIS
11                          5861 Pine Avenue, Suite A1
                            Chino Hills, California  91709
12                          (909) 466-4400
                            emorris@lawsclg.com
13

14   For the Defendants:    Manning and Kass, Ellrod, Ramirez,
                            Trester LLP
15                          By:  ROSLYNN WILFERT
                                 STEVEN J. RENICK
16                          801 South Figueroa Street, 15th Floor
                            Los Angeles, California  90017
17                          (213) 624-6900
                            roslynn.wilfert@manningkass.com
18                          steven.renick@manningkass.com

19                          Peterson, Bradford, Burkwitz,
                            Gregorio, Burkwitz and Su LLP
20                          By:  AVI BURKWITZ
                                 VINCENT CONTRERAS
21                          100 North First Street, Suite 300
                            Burbank, California  91502
22                          (818) 562-5800
                            aburkwitz@pbbgbs.com
23                          vcontreras@pbbgbs.com

24

25
```

1    LOS ANGELES, CALIFORNIA, FRIDAY, AUGUST 30, 2024, 10:55 A.M.

2         (Call to Order of the Court.)

3         THE CLERK:  Calling item No. 2, LA 22-3968,

4    *Adrian Humberto Rios, et al. v. City of Azusa, et al.*

5         Counsel, please state appearances starting with

6    plaintiff.

7         MARCUS S. BOURASSA:  Good morning, Your Honor.  I'm

8    Marcus Bourassa appearing for plaintiffs.  I'm joined at

9    counsel table by Geralyn Skapik and Eric Morris.  Also

10   present with us are Mark Skapik, fellow plaintiffs' counsel,

11   and our client Brenda Ceja.

12        THE COURT:  Good morning to all of you, and welcome

13   back.

14        ROSLYNN WILFERT:  And Good morning, Your Honor.

15   Roslynn Wilfert for City defendants -- City of Azusa.  To my

16   right is Steve Renick.  He'll be handling the motion for

17   summary judgment today.  Thank you.

18        THE COURT:  Thank you.

19        AVI BURKWITZ:  Good morning, Your Honor.

20   Avi Burkwitz on behalf of the County and Mr. Dao, and with me

21   is Mr. Contreras to my right -- Vincent Contreras.

22        THE COURT:  Thank you very much.

23        All right.  The matter is on calendar for three

24   things:  the motion to continue the trial and modify the

25   scheduling order, an ex parte motion to strike a declaration,

1  and the motion for summary judgment with respect to the

2  Second Amended Complaint.  Prior to taking the bench today,

3  my clerk distributed a tentative.  I should say it's very

4  tentative.  It's been a tough week; so I haven't had as much

5  time to think about it as I would like or normally.  So it's

6  very tentative.

7        But with that, who would like to be heard first on

8  behalf of the defendants?

9        MS. WILFERT:  Your Honor, Mr. Burkwitz was the one

10  that filed regarding the motion for continuance of trial.  If

11  he would like to --

12        THE COURT:  Oh.  No.  I mean, I think the

13  continuance of trial and the motion to strike -- I'm pretty

14  set on those.  So why don't we just focus on the summary

15  judgment motion.

16        MS. WILFERT:  Thank you.

17        STEVEN J. RENICK:  Thank you, Your Honor.  Would

18  you like me to go to --

19        THE COURT:  Yes, please.

20        MR. RENICK:  Good morning, Your Honor.

21  Steven Renick for the Azusa defendants.

22        I've reviewed the tentative, and if this is the

23  very tentative tentative, I am very impressed.

24        THE COURT:  (Laughs.)

25        MR. RENICK:  Obviously, we would submit on the

1  portions that would grant the motion.  So I'll focus just on,

2  essentially, the excessive-force issue.  The state claims

3  pretty much go along with that --

4          THE COURT:  Right.

5          MR. RENICK:  -- issue.

6          THE COURT:  Right.

7          MR. RENICK:  I would like to backtrack a little bit

8  to the Brown Declaration issue.

9          THE COURT:  Okay.

10          MR. RENICK:  I understand Your Honor's pretty set

11  on denying the ex parte, but we also objected to the motion

12  on the same grounds as the ex parte but also on the issue of

13  competence.  As was stated in the objections, Mr. Brown has

14  literally been found not mentally competent to stand trial by

15  the Los Angeles Superior Court, and on that basis criminal

16  charges against him were dismissed.  There is nothing that

17  the plaintiff has provided by way of evidence or any sort of

18  indication to indicate that Mr. Brown is competent to provide

19  testimony regarding an incident that occurred three years

20  before the date the declaration was signed, and given that

21  there literally is a court order saying he's not mentally

22  competent -- I think absent that his declaration should be

23  struck on the basis that there's no evidence that he is

24  competent to give testimony.

25          THE COURT:  I guess I just feel like that's still

1   -- that's a question of fact and not a question of -- for me

2   as the gatekeeper.  I sort of feel like that I'd be weighing

3   the court order and the three-year time gap against, you

4   know, his testimony and him coming up here and saying, "I may

5   not have been competent to stand trial in a criminal case

6   against me, but I remember this."  And so I just -- I didn't

7   feel like I could substitute my judgment for the finder of

8   fact.

9         MR. RENICK:  And I understand that, but the

10  response that I'd make is that as counsel's pointed --

11  plaintiffs' counsel has pointed out, ironically, the same set

12  of attorneys are handling on both sides Mr. Brown's personal

13  civil rights matter that's ongoing.  So plaintiffs' counsel

14  is well aware of the finding of mental incompetence on the

15  part of Mr. Brown; yet there's nothing in the declaration

16  along the lines of what you said, saying, "I may not have

17  been competent then, but I'm competent now."  It just reads

18  like a normal declaration that anybody else might submit

19  without even attempting to address the elephant in the room,

20  which is that he literally had a criminal case dismissed

21  because he was literally incompetent to stand trial.

22        I think that's not something that goes to weighing

23  of the evidence so much as the plaintiff has not even

24  attempted to provide evidence that would allow this

25  declaration to be deemed sufficiently legally credible to be

1  considered at all.

2        THE COURT:  Let me -- well, let me flip that on you

3  for a second.  Did you find a case from any jurisdiction that

4  said that an independent finding of incompetence would

5  preclude testimony in a unrelated case?

6        MR. RENICK:  I haven't.  I think, though, that one

7  way to look at that is that this is -- the finding is

8  essentially an adjudicated fact, and the courts take, you

9  know, judicial notice of adjudicated facts all the time, and

10  this is one that's there.  And it's from January of this

11  year.  We're not talking about something that was from years

12  gone by.  It's eight months ago.  So I won't keep beating on

13  it but --

14        THE COURT:  Okay.  All right.  Thank you.

15        MR. RENICK:  All right.  Turning to the excessive-

16  force issue, reviewing the Court's tentative, the first

17  section is the Court's finding regarding the type and amount

18  of force used, and the Court comes to the conclusion that a

19  jury could find that deadly force was used.  I'm not going to

20  fight about that.  I mean, if Mr. Brown's testimony is there,

21  so be it.

22        But I do want to address the Court's finding about

23  government interest because the discussion in the tentative

24  essentially asks the question: Was there government interest

25  to use deadly force?  And the problem is that there are two

 1  parts to the physical interaction here.  The first part was

 2  when the officers first move to take Mr. Rios into custody.

 3  There was no use of deadly force at that point.  The idea was

 4  -- and I'll get into the question of the legitimacy of this

 5  -- to take him into custody.  Given how he was acting, the

 6  case law makes it clear that a certain amount of force can be

 7  used, not necessarily deadly force but some amount of force,

 8  and so the initial decision to move towards him, interact

 9  with him was intermediate force, and so the discussion really

10  isn't on point in that sense.

11         The issue of deadly force comes in after they've

12  engaged with him, and as the discussion in the first section,

13  if we accept that deadly force is used, we have to look at

14  why that deadly force was allegedly being used.  This was an

15  attempt to put him into restraints, to handcuff him, to take

16  him into custody, and he was resisting and --

17         THE COURT:  Well, according to all of the officers,

18  he was resisting.  According to Mr. Brown, he was not.

19         MR. RENICK:  Yeah.  I --

20         THE COURT:  I understand why the City and the

21  County are taking that position.  I think that it's

22  understandable given their view of the facts.  The problem is

23  that Mr. Brown has a different view of the facts, and I think

24  that's up to the jury to decide.

25         MR. RENICK:  Well, I ask a little indulgence on the

1  part of the Court.  It's -- there's a reasonable chance that,

2  you know, the qualified immunity issue may be taken up on

3  appeal.  I --

4          THE COURT:  I suspected so.  Yes.

5          MR. RENICK:  And one of the issues that I think

6  could and would be brought is the admissibility of

7  Mr. Brown's declaration given that it is so crucial.

8          THE COURT:  Yes.

9          MR. RENICK:  And so I would ask the Court's

10 indulgence to, perhaps, let us have a colloquy as if his

11 declaration was not there because, if the Ninth Circuit were

12 to say, "No.  The declaration should have been excluded,"

13 then rather than simply coming back and doing this all over

14 again, if the Court were to come to the conclusion -- which

15 we obviously, you know, think you should -- that, you know,

16 absent that declaration there is not sufficient evidence to

17 take to the jury excessive force.  Obviously, that's up to

18 you whether you want to indulge that.

19         THE COURT:  I mean, I think I'm comfortable with

20 saying that in the alternative -- in an alternative universe

21 where Mr. Brown's declaration didn't exist, I don't think

22 that I have enough of a hook to send the case to the jury

23 because assuming that the facts happened the way that the

24 officers described that it happened, that he took a bladed

25 stance when they approached him and that he was resisting and

1  kicking the entire time until he was fully restrained -- I

2  don't know that that presents a jury question.

3           MR. RENICK:  Okay.  That's exactly what I was

4  hoping for.

5           In that case, the only other issue I would bring up

6  -- because I suspect plaintiffs will also argue this -- is

7  the decision to interact with him at all.  The Court granted

8  the -- tentatively has granted the summary judgment on the

9  *Monell* issues, which address the question of the training,

10  the appropriateness of the interactions, and what goes

11  through that is the argument coming from their expert

12  Mr. Defoe that the officers should have called in crisis-

13  intervention specialists or they should have brought in

14  mental health -- they should have done something different.

15           But what that ignores is the fact that these are

16  not officers who came upon a scene and, after evaluating it

17  for a minute or two, went after the suspect.  They were there

18  for a full half an hour interacting with him, attempting to

19  de-escalate the situation.  This is not a situation where

20  they just willy-nilly went forward.  And so the question then

21  becomes -- in reaction to what I think the plaintiffs will

22  argue -- at what point do you, as the expert says, keep on

23  doing nothing?  They were called out because the residents of

24  this apartment building were clearly scared.  According to

25  the plaintiffs, Mr. Rios had been there most of the day

1    acting in what they described as a clearly confused and

2    mental-health crisis state, but at some point it changed to

3    make the residents scared enough to call the police, not just

4    one but at least three separate calls.

5             The officers arrived.  They attempted to interacted

6    with him.  They attempted to de-escalate.  They called the

7    fire department and paramedics.  They did basically

8    everything that the expert said would have happened if the

9    crisis-intervention people had come.  At some point that has

10   to end.  The -- we cited case law from the Ninth Circuit that

11   there are not two standards of excessive force, you know, a

12   different one for mental-health crisis -- you know,

13   situations.  At some point the officers said, "We've got to

14   do something," and so they decided to take him into custody.

15   They had reasons to believe that that was appropriate, and

16   they acted.

17            So that -- going back to my initial -- that initial

18   decision to take him into custody and -- with the idea of

19   some intermediate level of force was justified under the

20   circumstances, and so our position would be that this entire

21   process was appropriate, and as Your Honor said, absent

22   Mr. Brown's declaration, the use of force at all levels was

23   appropriate.

24            So unless Your Honor has questions, I would submit

25   at this point.

```
 1              THE COURT:  I don't think so.  Thank you.

 2              MR. RENICK:  Thank you, Your Honor.

 3              THE COURT:  All right.  Mr. Bourassa?

 4              MR. BOURASSA:  Thank you, Your Honor.

 5              Your Honor, like my friend did, I'll for a moment

 6  address the matters the Court has, I think, more or less made

 7  up its mind on.  But on the motion to continue trial, it -- I

 8  think some of the description of the state of affairs with

 9  respect to experts in the tentative is not correct.

10              THE COURT:  Oh.

11              MR. BOURASSA:  At this point only one retained

12  expert deposition, I believe, remains to be done.  I'm

13  looking at my colleague to see if that's right.  But it's

14  Mr. Defoe, and it's scheduled to happen next week within --

15              GERALYN L. SKAPIK:  Mr. -- Dr. Bellezzo as well.

16              MR. BOURASSA:  Oh.  And Dr. -- there are two.

17  Dr. Bellezzo and Dr. Defoe.

18              MS. SKAPIK:  I'm sorry, Your Honor.  Dr. Bellezzo.

19              MR. BOURASSA:  But they're both scheduled to occur

20  within the time period the parties have stipulated to extend

21  expert discovery for.

22              So I saw in opposing counsels' reply on that matter

23  that the -- there was a Daubert deadline August 29th.  I

24  don't know where that came from.  We would have treated that

25  as an in lim in the Court's order.  But in any event, I
```

1    recognize that I have the laboring oar there, and the Court's

2    asked me to focus on the motion for summary judgment so --

3            THE COURT:  Well, and I think as a realistic matter

4    -- you can tell me otherwise -- but given what I'm about to

5    do, they're going to appeal anyway, and so these dates are

6    all, you know, sort of made up.

7            MR. BOURASSA:  And I -- to -- as the Court read

8    correctly in our opposition, I -- really, we wanted some

9    indication on that front because that is the bigger time

10   effect.

11           THE COURT:  Yes.

12           MR. BOURASSA:  So moving to the motion for summary

13   judgment -- and I'll walk through some of what my colleague

14   addresses.  The -- for Mr. Brown, the "elephant in the room,"

15   so to speak, of this court order, I think, is ultimately that

16   he's a man who's autistic.  It's not that he is, you know,

17   some outlandish person who can't recount facts.  And the -- I

18   -- from their brief was the first that I personally learned

19   of this order from state court.  They didn't submit it or

20   what the findings were.  I'm not familiar with what

21   ultimately was found or even the standard.  I think they said

22   that there had to be a finding of some mental disability.

23   Certainly, that wouldn't suffice to keep someone off the

24   witness stand.

25           And really importantly and part of why -- it was

1  relevant of course to the timing as well, but really

2  importantly, Mr. Brown made a prior consistent statement as

3  well.  It is -- this is not something that he made up three

4  years later.  We -- it turns out that we spoke to him soon

5  after this incident.  We just couldn't find him in the

6  intervening time.

7          THE COURT:  I see.

8          MR. BOURASSA:  And so it's one of these situations

9  where I think, really unfortunately, it may be that counsel

10  is a witness in this narrow respect, if they're going to

11  attempt to impeach him, because the -- with his subsequent

12  lawsuit, his subsequent beating at the hands of some of the

13  same officers, I know that they will dispute all of those

14  facts, and it's going to be a thorny issue to navigate for

15  trial, but he made a prior consistent statement before any of

16  that, before this court order about his competency, charges

17  -- any of those other things.

18          THE COURT:  And that was to counsel?

19          MR. BOURASSA:  Yes.

20          THE COURT:  Okay.  No paralegal present?

21          MR. BOURASSA:  I think there were multiple people.

22  Like, two members of our team interviewed him together but --

23  sometimes counsel becomes a witness by accident, and I don't

24  -- none of us expected it would go this way so --

25          THE COURT:  Sure.  Understood.

1          MR. BOURASSA:  The -- of course -- I think my

2     friend recognizes that considering his declaration, almost

3     every other component of the MSJ on the excessive-force front

4     falls aside, but I do want to take up the sort of alternate

5     reality theory.

6          I -- the -- our colleagues understand that on

7     appeal in an MSJ context on qualified immunity they're going

8     to get a de novo review.  So I don't know why they need to

9     invite you to consider an alternative universe, but this is

10    not a case that is going to turn just on Mr. Brown's

11    declaration or what -- the -- his credibility as a witness

12    either.  The medical evidence and the officers' own testimony

13    is going to corroborate the fact that these officers

14    asphyxiated this man.  When he gets in the ambulance, within

15    minutes -- on the "denial of medical care" claim, I realize

16    they argue persuasively that he's very quickly in the

17    ambulance, and what they find very quickly in the ambulance

18    is that this man is already asphyxiated.  His O2 levels are

19    dangerously low.

20         Now, what does that medical evidence suggest?  It

21    suggests that they -- that their testimony about what

22    happened is not the case, and it's a lot like the *Nehad* case,

23    where the -- in *Nehad* -- this is our -- in our section about

24    officer credibility and the inconsistencies -- they said the

25    only evidence really contradicting the surviving officers'

1    claims was that he omitted something in his first interview

2    three hours after the incident.  Now, here, all of these

3    officers within minutes failed to mention that they had hurt

4    Mr. Rios at all to the paramedics who arrived to treat him.

5    None of them uttered a word about what they had just done to

6    this man before the paramedics were allowed to come and see.

7    That's a pretty significant omission to someone who has to

8    treat this man.  And then the medical evidence will --

9    corroborates the asphyxia in the same way I've described.

10           But in *Nehad* -- and give me just a moment to refer

11   to my note -- they -- the court analyzed a late claim by the

12   officers to say, "Oh, well, I thought that he had a knife.  I

13   mistook a pen for a knife."  And it's a lot like the claim

14   here that we hear over and over, "Well, I thought he might

15   have still had a gun" -- all evidence to the contrary -- and

16   just like in *Nehad*, a reasonable juror could reject that

17   outright given the amount of time that they had to watch this

18   man and his behavior with his thumb up, his finger pointed

19   out, yelling "Bang.  Bang"?  It's just an unreasonable

20   factual claim that it self-impeaches it, and a juror could

21   reject it without hearing anything from Mr. Brown.

22           Expert Scott Defoe, long-time Los Angeles law

23   enforcement, who himself has been shot, it going to testify

24   that this is a case that likely involved positional asphyxia

25   and the struggle to breathe.  Now, some of the officers'

1  claims about resistance -- a jury could even believe some of

2  that, but what it is, is a man trying to breathe after being

3  attacked.  And one of the officers themselves -- I almost

4  think of it as, like, a slip-up in the consistent theme.

5  They were so careful to say he was never on his stomach --

6  because these officers know about *Drummond* and the clearly

7  established law about downward pressure on a restrained

8  individual -- but what does one of them say?  He says that --

9  at one point in his deposition he says, "He kept trying to

10 roll back onto his stomach."  A reasonable juror could infer

11 from that that Mr. Rios had in fact been on his stomach.  And

12 that's all before you get to Mr. Brown so --

13         THE COURT:  I don't know that there's any other

14 inference to make from that statement.  So --

15         MR. BOURASSA:  Shifting some -- the only area of

16 the tentative where I really want to focus some of my

17 argument where we disagree with the Court's initial

18 impressions have to do with the familial association claim.

19         THE COURT:  Okay.

20         MR. BOURASSA:  The -- so this is Mr. Rios's wife's

21 claim, their children's claims for denial of familial

22 association, and recognizing that the Fourth Amendment

23 standard and the Fourteenth Amendment standards differ --

24 which is part of the -- important part of the Court's

25 tentative -- the Ninth Circuit has said that there's

1    substantial overlap between these things and so -- of course

2    my computer has -- is failing me.

3            In the briefing on the MSJ -- this is sort of why

4    I'm trying to find the cases now.

5            In the briefing on the MSJ, defendants' argument

6    was "For the reasons already stated, we should get qualified

7    immunity," and at that point the only reasons stated were the

8    Fourth Amendment reasons.

9            THE COURT:  Right.  Right.

10           MR. BOURASSA:  And so we responded -- I hope not

11   unreasonably --

12           THE COURT:  To that.

13           MR. BOURASSA:  -- "For the reasons we stated,

14   they're not entitled to qualified immunity."

15           And then in reply, they said, "Well, where's the

16   Fourteenth Amendment case?" and --

17           THE COURT:  I see.

18           MR. BOURASSA:  And so I -- given an opportunity, I

19   can muster clearly established law on the familial

20   association rights for the Court, and I've tried to do so

21   here.  Here's an example I could refer the Court to:  *Zion v.*

22   *County of Orange*, 874 F.3d 1072.  This -- and really the --

23   this talks about police violence against somebody that

24   ultimately kills them that violates both the Fourth and the

25   Fourteenth Amendment because they really do overlap if the

 1   conduct shocks the conscience, and that standard is important

 2   here because just like if you accept -- if you accept

 3   Mr. Brown's declaration in considering all of the claims,

 4   it's really hard to interpret this as anything short of

 5   shocking the conscience, and when you step back a little back

 6   and think about the purpose of qualified immunity is to make

 7   sure that officers don't -- aren't found liable for

 8   constitutional violations that they couldn't -- that a

 9   reasonable officer wouldn't have known was a violation, I

10   think Mr. -- what Mr. Brown describes is an obvious

11   violation.  No question you can't run up, tackle, kick in the

12   head noncompliant -- or totally compliant suspects, right.

13            THE COURT:  Yes.

14            MR. BOURASSA:  And so as if we need -- if there

15   were a case saying that, I suppose the officers would have a

16   different type of notice under the clearly established law

17   prong, but this is an obvious case on the Fourteenth

18   Amendment before we get to some of the cases that I'm happy

19   to submit to the Court, if given an opportunity, and I've

20   tried today to hastily put something together.

21            THE COURT:  Why don't I give you -- I have a

22   deadline for getting this out.  So if you file it by the end

23   of the day on Tuesday -- I just need a list of cases.

24            MR. BOURASSA:  That's --

25            THE COURT:  I don't need any argument.

 1              MR. BOURASSA:  That's plenty of time, Your Honor.

 2              THE COURT:  Okay.  All right.  Great.

 3              MR. BOURASSA:  If you'll give me just a moment to

 4    confer with counsel?

 5              THE COURT:  Sure.

 6              MR. BOURASSA:  I don't think I have anything else I

 7    wanted to take up.

 8              THE COURT:  Sure.

 9              (Pause.)

10              MR. BOURASSA:  My colleague makes a point, which is

11    really supplemental to some of the points I've already made,

12    but that on the positional asphyxia front, the struggle to

13    breathe, Mr. Defoe will also explain that he himself hears in

14    the limited video that we have the guttural noises from

15    Mr. Rios -- and really all of the officers say that he was

16    making noises, he was yelling --

17              THE COURT:  Uh-huh.

18              MR. BOURASSA:  -- but Mr. Defoe can -- will explain

19    that those guttural noises are consistent with the positional

20    asphyxia effort to breathe.  It's a noise that's -- it's a

21    little bit specific but with the limited video we have gives

22    us some of Mr. Rios's noises, which -- and we -- it also

23    gives us Mr. Rios yelling, "I'm not fighting," which is also

24    very hard to square with the officers' claims.  I realize

25    it's a little bit self-serving if you interpret it one way or

1  the other --

2           THE COURT:  Yeah.

3           MR. BOURASSA:  -- but it's omitted from all the

4  officers' reports.  They're not proud to have continued to

5  literally punch him concededly in the face while he yells it,

6  and of course the video of the punches is unaccounted for

7  anywhere in the reports by the officer who we know delivered

8  those punches.  You know, he says he delivered three.  It

9  turns out there's video of five.  He didn't know the video

10  existed when he wrote his report.  So they'll be heavily

11  impeached before Mr. Brown testifies.

12          And I think with that we would submit, Your Honor,

13  on your tentative.

14          THE COURT:  Okay.  Thank you.

15          Mr. Renick, I think one thing that he has

16  definitely convinced me of is that I'm not going to opine on

17  the alternate universe that isn't before me.

18          MR. RENICK:  Okay.

19          I'd like -- I have a number of comments, but I

20  would like to address Your Honor's allowing them to submit a

21  list of cases.

22          THE COURT:  Yeah.

23          MR. RENICK:  We would like an opportunity to

24  respond.  It was the plaintiffs' burden to produce these

25  evidence.  So that should have been in their portion of the

1    joint memorandum of points and authorities.

2              THE COURT:  But it's your motion.

3              MR. RENICK:  No.  But the case law says that the

4    burden to show clearly established law is on the plaintiff.

5              THE COURT:  Oh, I see.

6              MR. RENICK:  And so they should -- as far as the

7    Fourteenth Amendment part, they should have had it.  The fact

8    that we pointed out that they hadn't wasn't raising a new

9    issue.  That was pointing out they hadn't met their burden.

10              THE COURT:  I see.

11              MR. RENICK:  If the Court's going to give them an

12    opportunity to put that case law in, we should have an

13    opportunity to say, "Well, no.  That's not really on point"

14    or "it's not applicable" -- or whatever.  So I don't know

15    what timing you want on that or whether you agree.

16              THE COURT:  Can you have something filed by

17    Thursday?

18              MR. RENICK:  If we get it on Tuesday, I'm sure we

19    could.

20              THE COURT:  Yes.  Okay.  So you can file a

21    response, it can be up to ten pages -- although I hope not

22    -- by Thursday noon?  Is that --

23              MR. RENICK:  Whatever Your Honor wants.

24              THE COURT:  Okay.

25              MR. RENICK:  Noon.

1          THE COURT:  I don't want to put an unreasonable

2    burden on you, but I do need to get this order done.

3          MR. RENICK:  No.  I understand --

4          THE COURT:  Okay.

5          MR. RENICK:  -- and we'll do what we need to do.

6          THE COURT:  Okay.

7          MR. RENICK:  Okay.  Going through the various

8    comments that were made, counsel started off by addressing

9    the Brown Declaration issue, pointing out that their position

10   is Mr. Brown is autistic and that's what's going on.  Well,

11   there are two comments on that.  Autism is a range of things.

12   One would suspect that it must be very severe to have

13   resulted in him being found mentally incompetent.  The other

14   point is it was not in the declaration, it wasn't in anything

15   this is brand new, and I don't question counsel's

16   understanding that that's the situation, but, you know, we're

17   missing anything in the record that actually indicates that

18   this man is competent to give a declaration.

19          THE COURT:  Yeah, but leaving all that aside, I

20   mean, I think one thing that Mr. Bourassa said that was

21   particularly noteworthy, to me, is he said that he didn't

22   know specifically what standard was applied by the superior

23   court in January when -- at -- when it reached its

24   conclusion, and it occurs to me that what I remember of the

25   standard is it's the ability to assist counsel in his

1   defense.  That seems to be a very different standard, to me,

2   as to whether or not he can recall a particular event or not.

3           MR. RENICK:  I think that the ability to recall and

4   provide meaningful, competent information to counsel would be

5   part and parcel of the question of whether or not -- and --

6           THE COURT:  It's a piece, but I don't think it's

7   determinative.

8           MR. RENICK:  And I agree, but that's the problem

9   that we've got.  We literally have no information, and yet

10  there is this fact that's sitting out there that counsel just

11  has not addressed and that we think should have been

12  addressed before this, you know, was submitted.  Counsel

13  mentioned that there was a prior consistent statement.  He

14  didn't indicates specifically when.  My guess is he's talking

15  about the communications that he had -- or he or his staff

16  had earlier this year when they were going out and reviewing

17  people.  If it --

18          THE COURT:  I think he -- well, but he specifically

19  added that it was not something that was made up three years

20  later.  So it must have been some point in the past.

21          MR. RENICK:  Well, that, then, raises the question

22  -- which gets back to essentially the ex parte and the other

23  aspect of the objection -- if they had more specific

24  information from Mr. Brown about this incident such that it

25  would be consistent with the declaration, why wasn't that

1  ever provided to defense counsel?  The most that they've said

2  was provided was his existence and that he would testify

3  about the incident, but if they had explicit information

4  indicating that he observed the incident, observed the

5  officers engaging in shocking behavior -- which I believe is

6  the language he used in the declaration -- that would seem to

7  be something that should have been provided.  If it was not

8  that long ago, a few months ago, fine, then we're within that

9  whole period, but if it's long enough ago to make the

10  question of consistency relevant, then we have to go back to

11  the question of: Why was this not provided?  And I think that

12  is a significant issue.

13          THE COURT:  Sure.  I think that there are many

14  explanations swirling around in my head with respect to this

15  particular witness in this particular context who also

16  happens to be a client of the firm in a totally unrelated

17  context.  So I -- you know, the fact that the statement got

18  filed away in one file and suddenly has pertinence in another

19  file -- I --

20          MR. RENICK:  I understand that, Your Honor, except

21  that as counsel has stated -- and I believe it's in paperwork

22  here -- he didn't become their client until earlier this

23  year.  So it's not a matter of a couple of years ago this

24  statement being filed in the other case --

25          THE COURT:  I see.

1          MR. RENICK:  -- and being not understood.  If there

2     was communication with him prior to them interacting with him

3     as a client and it was not just this year, then we have the

4     problem of why was that information not provided?

5          THE COURT:  I see.

6          MR. RENICK:  Going onto some of the other points

7     that counsel made, he talked about the fact that there was

8     evidence that the officers asphyxiated the plaintiff.  I

9     think we've discussed in our paperwork that we don't think

10    that the medical evidence quite shows that, but there is no

11    dispute that there was -- well, I guess there is a dispute if

12    you take Mr. Brown's testimony -- but that there was a

13    struggle to get Mr. Rios restrained, put in handcuffs.  In

14    the context of that, it wouldn't be surprising if he ended up

15    on his stomach.  They're -- they point out that there's

16    evidence that could have suggested that.  But it's not simply

17    being put on the stomach that raises a question.  It's

18    pressure being put on the suspect while they're on their

19    stomach, and that's not there.  There's no -- at no point --

20    again, perhaps other than Mr. Brown --

21         THE COURT:  Well, I think we're talking about -- I

22    think what you're talking about right now is the alternative

23    universe, and so I don't feel like we need to spend time on

24    that because I'm not going to rule on a set of facts that

25    isn't in front of me.

1          MR. RENICK:  Okay.

2          I'm not sure if this is an alternative universe

3    issue, but counsel pointed out that they failed to inform the

4    paramedics.  Well, that raises the question: Were they asked?

5    The paramedics are the ones who are interested in what the --

6    a potential patient's situation is.  They would ask what they

7    believe are relevant questions.  It's not the burden of the

8    nonmedical personnel to figure out exactly what the

9    paramedics need.  The paramedics presumably were busy doing

10   what they felt they needed to do, and if they wanted any more

11   information, there was certainly nothing preventing them from

12   asking.  So I don't think that fact, in and of itself, is --

13   shows anything beyond -- well, nothing really.

14         Counsel also argued the officers believed it was

15   possible he had a gun but a jury must misbelieve that he had

16   a gun.  Well, but that's not the issue.  The issue is whether

17   it was reasonable for the officers to believe he might have a

18   gun.  The man had spent quite a while saying, "I'm going to

19   shoot you," "Bang.  Bang," you know -- I mean, he was making

20   a lot of statements that indicated it was at least possible

21   he was armed.  He was wearing loose-fitting clothing which

22   might have --

23         THE COURT:  I agree with you, but again, that's a

24   factual question that I think the jury has to resolve, not

25   me.

 1          MR. RENICK:  Okay.  I'm not sure, you know, quite

 2  where the line is.  So I apologize if I drift over that.

 3          THE COURT:  That's okay.

 4          MR. RENICK:  Okay.  The last issue I bring up -- I

 5  already addressed that.

 6          Oh.  Yeah, I guess the issue of the guttural noises

 7  would also be an alternate-universe issue.

 8          THE COURT:  Well, I mean, I think -- again, that's

 9  a factual question for the jury to decide.  Are they

10  indicative of something or are they not?

11          MR. RENICK:  Okay.

12          THE COURT:  I think they have to decide that.

13          MR. RENICK:  Okay.  Then with that, unless the

14  Court has questions, I would submit.

15          THE COURT:  I don't.  Thank you.

16          Mr. Bourassa, do you want to add -- do you want to

17  respond to the suggestion that it's too late for the prior

18  consistent statement?

19          MR. BOURASSA:  Yes, Your Honor.

20          And I -- the -- we've laid out in detail in

21  Mr. Morris's declaration in response to this ex parte motion

22  the sequence of events.  Approximately three -- I'm reading

23  from it, but I'll try to summarize.  About three weeks after

24  the police attacked Mr. Rios, Mr. Morris, I believe with

25  co-counsel, visited the apartment complex to try to interview

1    witnesses.  They met a man there who told them he had seen

2    officers kick Mr. Rios in the head, but they took him as

3    being nervous and not wanting to speak to them.  As a result,

4    they were not able to speak to him for long or take a

5    detailed statement, and he explicitly refused to give his

6    name.

7            THE COURT:  Oh.

8            MR. BOURASSA:  So then we get to Rule 26

9    disclosures, and we disclose other witnesses at the apartment

10   complex, which is all that we know, really, of this guy,

11   expecting never to see him again -- and he wasn't the only

12   one who was nervous to talk to us.  I mean, there had just

13   been a significant police event.  Many people gave us only

14   first names, we disclosed those names, as much as we knew

15   about them, in the Rule 26 disclosures, and then this year I

16   -- just illustrating, I think, Mr. Morris's diligence to some

17   degree, he's looking for other lawsuits that are active

18   against Azusa, and what does he find?  He finds this

19   gentleman's case where he seems to -- the -- he identifies --

20   let me -- I'm refreshing my memory about how he realized the

21   connection, but he realizes this guy might have been a

22   witness in our case --

23           THE COURT:  I see.

24           MR. BOURASSA:  -- and they go and meet him, and he

25   goes, "Oh, my" -- "You are the witness," like, "I remember

1    talking to you," and then they learn his name, and then they

2    talk to him and get a detailed statement from him, and then

3    that's when within days they issue the subpoena for his

4    deposition, and I realize they complain about the adequacy of

5    that and the Rule 26 disclosures that came subsequently but

6    the -- that's the prior consistent statement chronology, that

7    they took the statement years earlier from a man they never

8    thought they would see again who they couldn't identify and

9    then identified him.

10             THE COURT:  Okay.  All right.

11             MR. RENICK:  Your Honor?  May I just make some

12   brief comments?

13             THE COURT:  Oh.  Sure.

14             MR. RENICK:  The key aspect of Mr. Brown's

15   declaration is that, according to him, Mr. Rios was

16   cooperating, laid down, and the police essentially attacked

17   him.

18             THE COURT:  Yes.

19             MR. RENICK:  The description of the statement from

20   shortly after the incident, as described by plaintiffs'

21   counsel just now, is that he saw it and he saw them kick him

22   in his head.  There's nothing about the circumstances --

23   nothing about the context in which it happened, nothing about

24   him --

25             THE COURT:  It's a limited prior consistent

1    statement.

2              MR. RENICK:  Right.  And so, if a limit is there's

3    prior consistency that he was kicked in the head, okay, but

4    that's far beyond what is crucial about Mr. Brown's

5    testimony, and so I think --

6              THE COURT:  Yeah, but again, I think that goes to

7    weight and credibility, not something that I'm deciding as

8    the gatekeeper so --

9              MR. RENICK:  Okay.  Thank you, Your Honor.

10             THE COURT:  All right.  Thank you all very much.

11   The matter is taken under submission.  We'll issue an order

12   -- well, actually, the matter will be taken under submission

13   on Thursday after the City files its brief, and then we'll

14   issue an order, hopefully, rapidly after that.

15             MR. RENICK:  Thank you, Your Honor.

16             THE COURT:  Thank you all very much.

17             Was there anything else --

18             MS. SKAPIK:  Yes, Your Honor.

19             THE COURT:  Yes?

20             MS. SKAPIK:  Geralyn Skapik.

21             I just have some clarification on your continuance.

22             THE COURT:  Yes.

23             MS. SKAPIK:  We've already had the rebuttal expert

24   -- we already have had the rebuttal of -- filed -- the

25   rebuttals' reports filed.  We only have two depositions

1  pending.  So I don't know -- and they're already set.  So I'm

2  not sure that we're reopening all of this again.  So if we --

3  we submitted a declaration and a stipulation as to how we

4  were going to handle the remaining experts, and I would hope

5  that we could just go by what we had --

6         THE COURT:  I'm not intending to reopen discovery

7  to --

8         MS. SKAPIK:  Allow expert --

9         THE COURT:  -- allow everything.

10        MS. SKAPIK:  Okay.

11        THE COURT:  The only thing that might matter to me

12  is, you know, their ability to depose Mr. Brown.

13        MS. SKAPIK:  Thank you, Your Honor.

14        THE COURT:  Okay?

15        MS. SKAPIK:  Thank you.  That's what I (inaudible)

16  clarification on.  Thank you.

17        THE COURT:  All right.  And maybe I'm getting ahead

18  of myself, but I'm thinking that if that -- assuming that

19  Mr. Brown is a witness in the trial and assuming that the

20  Ninth Circuit affirms what I do with this order, I would

21  suggest, maybe, that instead of having Mr. Morris testify

22  that there's some sort of stipulation as to what the

23  testimony would be once it became relevant.

24        MR. RENICK:  I'm sure -- we'd be happy to discuss

25  that and probably can work something out.

1          THE COURT:  Okay.  All right.  Thank you all very

2    much.

3          MR. BURKWITZ:  Your Honor -- sorry.

4          THE COURT:  Oh.  Yes?

5          MR. BURKWITZ:  Just for clarity since we're already

6    talking about the trial date -- and this is Avi Burkwitz on

7    behalf of the County defendants.

8          The Court has indicated that the parties should

9    meet and confer about a new trial date.  I don't know with

10   respect to how that's going to work mechanically.  Does the

11   Court have a time deadline where the Court wants us to submit

12   something?

13         THE COURT:  I don't think so because there's likely

14   to be an appeal, and so it seems to me that counsel should

15   meet and confer once the appeal is, you know, on its way and

16   there's a better idea of what a realistic trial date is.  I

17   don't want to -- I don't want to order a placeholder just for

18   the sake of ordering a placeholder.

19         MR. BOURASSA:  I apologize, Your Honor.

20   Marcus Bourassa.

21         The -- one thing we asked in our opposition to that

22   motion was that there be some deadline for, like, an

23   indication.  I just wouldn't want the notice of appeal time

24   frame to be eating up, like, are we trial prepping?  Are we

25   not?

1              THE COURT:  Oh, I see.

2              MR. BOURASSA:  I assume, if the Court denies

3  qualified immunity, that there would be an interlocutory

4  appeal, and we just ask that there be some, at least,

5  indication you're going to file a notice of appeal.

6              THE COURT:  I mean, Mr. Renick, you're going to do

7  that -- right? -- because --

8              MR. RENICK:  Yeah.  I mean, obviously, it needs to

9  be run through the City, there's bureaucracy, there's -- you

10  know, but I assume that decision will be made fairly quickly.

11              THE COURT:  I mean, I --

12         (Proceedings adjourned at 11:38 a.m.)

13  ///

14  ///

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Julie Messa                    September 3, 2024
Julie Messa, CET**D-403            Date
Transcriber